NOTICE
Decision filed 11/30/18. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2018 IL App (5th) 170146

NO. 5-17-0146

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| EMILY R. RUSHING, n/k/a/ Moore, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 08-D-48 |
| | ) | |
| JAMES S. RUSHING, | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE Goldenhersh delivered the judgment of the court, with opinion.
Justice Cates concurred in the judgment and opinion.
Justice Overstreet dissented, with opinion.

**OPINION**

¶ 1   Respondent, James S. Rushing, appeals from an order of the circuit court of Marion County modifying the amount of child support to be paid to petitioner, Emily R. Rushing n/k/a Emily R. Moore. The trial court took into consideration the income of James' current wife, Jamie Rushing, to establish the amount of child support to be paid to Emily pursuant to section 505(a) of the Illinois Marriage and Dissolution Act (Marriage Act) (750 ILCS 5/505(a) (West 2014)). The court's order also provided that, in order for the child support award to be reduced and to rely solely on James' income, James and Jamie had to be physically separated, in the context of their legal separation.  The issues raised in this appeal are: (1) whether the trial court erred in

1

considering Jamie' income in determining the child support obligation owed by James; and, (2) whether the trial court erred in considering the legal separation allegations set forth by James, proffered to the court after the conclusion of the hearing on Emily's petition to modify child support; and, (3) whether the trial court erred in ruling that James and Jamie must be physically separated for the court to consider only James' income for child support purposes. For the reasons that follow, we affirm that portion of the circuit court's award of $467 per month in child support, as well as the award of arrearage and payment thereof. We find, however, that the circuit court abused its discretion in considering the status of James and his wife, Jamie, subsequent to the hearing, and therefore vacate the findings of the trial court related to the legal separation and award of the reduced amount of child support.

¶ 2                                    BACKGROUND

¶ 3      The parties married on August 12, 1995. Two children were born to the parties during the marriage. The trial court entered a judgment of dissolution on May 19, 2009, in which it awarded "sole care, custody[,] and education" of the two minor children to Emily, and ordered James to pay Emily $112 per week in child support.

¶ 4      At the time of the parties' divorce, James was self-employed in the heating and cooling business, earning $400 per week. On July 1, 2010, the parties filed a stipulation in which they agreed that James' "effort at self-employment" had failed and that he was currently employed by the City of Centralia, Illinois. The parties stipulated that the court should reduce James' child support obligation to $200 per month. On that same day, the circuit court entered an agreed order reducing James' child support payments to $200 per month.

¶ 5      On August 13, 2010, James' attorney filed an "Order/Notice to Withhold Income for Child Support" that alleged that James' child support obligation was terminated. This notice

2

bears the signature of only James' attorney, and the record does not include a written order or docket entry establishing that the circuit court ordered the termination of James' child support obligation. Emily subsequently admitted that she agreed to the termination of James' child support obligation at that time.

¶ 6     On October 26, 2015, Emily filed the petition to modify child support that is the subject matter of the present appeal. As of that date, the parties had only one minor child, and James had married Jamie Rushing. In her petition to modify, Emily alleged there had been a substantial change in circumstances in that expenses for the minor child had increased, considering the fact that the child was older and involved in extra-curricular activities. Emily also alleged that the cost of living had increased, and it was likely James' income had increased.

¶ 7     On November 20, 2015, James filed a response to Emily's petition to modify in which he asserted that no child support was warranted. James alleged that their minor child wanted to reside with each parent "as close to one-half time as practicable such that neither party should pay the other child support."

¶ 8     On July 11, 2016, just two weeks before the scheduled hearing date, James filed a petition for modification of the trial court's May 11, 2009, visitation order.  That order had awarded sole custody of the parties' then minor children to Emily and established the visitation schedule with James. In his petition for modification, James sought to have his parenting time modified to conform to the parenting time schedule the parties had been following, to provide additional parenting time, and to allow him to claim the minor child as a dependent tax exemption in alternating years.

¶ 9     On July 26, 2016, a hearing was held on the respective petitions filed by Emily and James. Prior to the hearing, James filed a financial affidavit which allegedly reflected his income

3

from his business, Rushing Investigations, a limited liability company, which specialized in performing background checks and investigations. The affidavit averred that James took a "Draw-as available," but failed to provide any weekly, monthly, or annual salary. Essentially, James reported no income.

¶ 10    The affidavit filed by James also indicated his total monthly living expenses were $5788.17 per month, including a house payment of $1198.85 per month with taxes and insurance. Attached to the affidavit was a document that was represented to be a copy of James' 2015 Individual Income Tax Return, Form 1040. It showed that Rushing Investigations incurred a net operating loss of over $2700.

¶ 11    James testified at the July 26, 2016, hearing that he had been operating his company, Rushing Investigations, for "about three years," and that he was in the process of developing clients. He presented an exhibit purporting to be a profit and loss statement that showed his business had generated $4345.41 in net income for the period between January 1, 2016, and June 30, 2016.

¶ 12    James stated that the last time he paid child support was in 2012. With regard to his day-to-day household expenses, James testified that he paid "half of what I can." He stated that 2016 had been "a pretty good year" up to that point, but that he did not have enough income to pay all the expenses listed on his financial affidavit. James admitted that he could not pay the household expenses, such as the house mortgage, utilities, and taxes, as identified in his financial affidavit, and that his wife, Jamie, helped with paying those expenses. He acknowledged that he and Jamie had joint checking and savings accounts, but he did not know how much money was in either account. James further testified that sometimes he writes the checks, and sometime his wife does. He stated he had "no idea" what his wife, Jamie, made in a year. James further

testified that he owed approximately $8500 on credit cards, and that he paid the debt through his business.

¶ 13    The Individual Income Tax Return, Form 1040 attached to the affidavit showed that James and Jamie filed a joint tax return in 2015, but the return attached to the affidavit included only income tax information for James. Upon questioning, James admitted that the tax return was not the actual tax return that he and Jamie had filed with the Internal Revenue Service (IRS). The income portion of the tax return showed negative numbers in the income section of the return. James testified that he did not know what those numbers represented, as his wife had prepared their tax return, and he was not sure what expenses had been listed for his business. The return showed that his business had a net operating loss in 2015. Overall, the specifics regarding the financial resources available to James were not clearly ascertainable through his testimony.

¶ 14    With respect to child support, James testified that he would like to have his daughter "half the time *** [t]hat way [he could] pay for anything she needs."

¶ 15    Emily's counsel also called Jamie Rushing as a witness at the hearing held on July 26, 2016. Jamie testified that she purchased the house they were living in prior to their marriage, and that she lived in the house with James and two of her children. Jamie explained that James moved into her house near the end of 2013, prior to their marriage, on January 2, 2014.  After they were married, James adopted her son. Emily's counsel sought to elicit testimony from Jamie regarding James' current living situation, and the financial resources available to him. When Emily sought to introduce evidence showing that James benefitted from Jamie's income with respect to payment of the monthly expenses James had claimed in his affidavit, James' attorney objected. James' counsel claimed this testimony regarding Jamie's income was irrelevant to the issue of James' child support obligation. The trial court allowed the testimony regarding Jamie's

5

income, but gave the parties additional time to present case law as to what weight should be given to this testimony and took the objection under advisement.

¶ 16    Thereafter, Jamie testified that she was self-employed as an infertility consultant. Simply put, she helps people who cannot have children find egg donors and surrogate mothers. She testified that her income from her business varied from year to year and that she did not know "off the top of [her] head" how much she usually made in any given year.  She concluded that she made less than $100,000 per year. Both parties questioned Jamie about the expenses that James had listed on his financial affidavit. Jamie testified that some of the expenses listed by James were household expenses for James, herself, and her two children, including the $1198.85 monthly expense listed for their house payment, plus taxes and insurance. Jamie also testified that the expenses listed on James' financial affidavit of $350 per month in utilities and $1100 per month for groceries were expenses for everyone in their household.

¶ 17    When asked about the 2015 tax return information attached to James' affidavit, Jamie indicated she had redacted certain provisions, as she did not believe information about her income was relevant. James' counsel had concurred in the redaction, but evidently did not alert Emily's counsel that the 2015 tax return document had been redacted.  Consequently, at the time of the hearing, there was very little information available to Emily's counsel regarding Jamie's income, and her contribution to household expenses.

¶ 18    During Emily's testimony, her attorney asked her about upcoming expenses for their child's extracurricular activities. Before Emily completed her testimony, however, the court intervened and determined that this line of questioning was irrelevant. The court stated that it was going to apply the child support guidelines because Emily had not pleaded a request to

6

deviate from the guidelines, and the court suggested that its application of the guidelines was "simply a matter of math."

¶ 19 On August 17, 2016, the circuit court entered an order granting James' motion to modify his visitation schedule "to align with the manner in which [James] has been visiting with his daughter for several years." This portion of the circuit court's order is not at issue on appeal.

¶ 20 With respect to child support, the circuit court ruled that "the income of [James'] spouse is relevant to [its] determination of child support." The court, therefore, ordered James to submit "the joint tax return, without redaction, that was offered as an exhibit during the hearing as well as an amended financial affidavit." The tax return and amended affidavit were to be submitted within 14 days of the court's order.

¶ 21 On September 1, 2016, rather than submitting the 2015 tax return, as ordered by the court, James filed a motion requesting the circuit court to reconsider its decision. On October 24, 2016, the circuit court denied the motion but clarified the basis of its ruling as follows:

"[James], albeit by agreement, has not paid support since 2010, despite employment and an ability to pay. His income currently comes from self-employment which he attests is minimal. It is clear that his lifestyle does not align with a pauper's income, however."

Once again, the trial court also ordered James to submit his amended financial affidavit and unredacted joint income tax return within 14 days.

¶ 22 James then filed a motion to certify the question of whether a court may consider the income of a current spouse in determining child support and asked for a stay pending the appeal. On January 4, 2017, the trial court denied James' motion to certify the question.

¶ 23 On January 20, 2017, James filed a second motion to reconsider and reopen proofs, seeking to reopen the proof from the July 26, 2016, hearing. In support of this request, James

7

attached an affidavit setting out additional evidence that he wanted to present. James attested in his affidavit that he and Jamie had not purchased any real estate together since they married on January 2, 2014. He claimed that the home in which they reside is owned solely by Jamie. James further claimed that he and Jamie legally separated on December 27, 2016. He further asserted, contrary to his testimony given during the hearing in July 2016, that he and Jamie did not maintain joint financial accounts of any type.

¶ 24 James also submitted tax returns which showed his gross business receipts or gross income for the years 2008-2016 as follows:

| "2008: | $15,620.00 |
| 2009: | $23,109.00 |
| 2010: | $ 5,426.00 |
| 2011: | $ 6,344.00 |
| 2012: | $ 9,836.00 |
| 2013: | $15,821.00 |
| 2014: | $ 9,500.00 |
| 2015: | $14,000.00 |
| 2016: | $17,250.00" |

¶ 25 In this new affidavit, James attested that he sold his home in 2014, which netted him $32,000 in proceeds, and that he had been using those proceeds to operate his business in an attempt to make it profitable. He testified that he had "no other source of income." James also stated that he did not have access to his and Jamie's joint 2015 federal income tax return, as "[i]t is in Jamie's possession."

¶ 26 In a docket entry dated January 25, 2017, the trial court denied James' second request to reconsider, but granted his request to reopen the proofs, in part. The court again ordered James to "supply the tax return that he filed in 2015, which includes the income information of his spouse." The court also ordered James to provide "a financial statement that reflects his current financial situation and data."

¶ 27 On March 20, 2017, in compliance with the circuit court's January 25, 2017, docket entry, and pursuant to a protective order entered on February 15, 2017, James filed under seal the two amended financial affidavits ordered by the court and filed a "tax return transcript" obtained from the IRS that reflected the information appearing on James' and Jamie's 2015 unredacted joint tax return. This 2015 Internal Revenue Service Tax Return Transcript for the tax period ending on December 31, 2015, listed gross receipts for Jamie's business at $370,934.00, and net gross receipts at $351,824.00. The transcript listed James and Jamie's tax filing status as "Married Filing Jointly."

¶ 28 In addition to filing the financial affidavits and the tax return information, James' attorney also submitted a proposed child support calculation sheet that reflected two different calculations: one was based upon the combined net incomes of James and Jamie, and one based on James' net income alone. The child support calculation sheet indicated that James and Jamie's combined net incomes equaled $2336 per month, while James' net income alone was $848 per month. The calculation sheet showed that 20% of their combined net incomes equaled $467 per month, and 20% of James' net income alone was $170 per month.

¶ 29 On March 20, 2017, the trial court entered its order determining child support payments, including the arrearage. The court found that James and his wife pooled their resources, such that James "was able to have a home and minimal household expenses and benefits of a healthy

9

income while he started a business, earned his own income, albeit minimal, and paid no child support since 2010." The circuit court accepted the calculations submitted by counsel for James, and entered an order establishing child support at $467 per month, retroactive to October 26, 2015, the date on which Emily filed her petition to modify child support. The trial court ordered James to pay the arrearage at a rate of $100 per month, and ordered that as long as back child support was owed, James was not allowed to claim the minor child as a dependent. Once delinquent support was paid in full, the trial court ordered the parties to "alternate the years in which each claims the minor for tax purposes."

¶ 30     The trial court further noted that in James' most recently updated affidavit, he "claims to be 'legally separated' from his current spouse." The court accepted this attestation as true but cautioned that the "phrase 'legal separation' " means a "physical and legal separation." The trial court repeated in its order the statement made by James that "he and his current wife are not living together and, thus, he is not benefitting from her resources, to include housing and income." The court went on to find that in the event James and his wife no longer "reside with one another," then the amount of child support James owed would be reduced to $170 per month. James filed a timely notice of appeal of the circuit court's child support order.

¶ 31                                   ANALYSIS

¶ 32                          I. Current Wife's Income

¶ 33     The first issue on appeal is whether the circuit court improperly calculated child support by combining James and Jamie's separate net incomes and applying the statutory guidelines to that total amount to arrive at the child support figure due. Preliminarily, it should be noted that the trial court accepted the calculations made by James' counsel, and Emily has not contested those calculations. The issue is, rather, the basis of the calculation. James insists that his current

10

wife's financial resources should not be considered in determining his child support obligation and asks us to reverse the trial court's order with direction that his child support obligation be established at $170 per month based solely upon his income. We are not persuaded by James' arguments and believe the circuit court properly considered Jamie's net income for purposes of calculating child support.

¶ 34    It is well settled that modification of child support rests within the sound discretion of the trial court, and its decision will not be disturbed absent an abuse of that discretion. *In re Marriage of Bussey*, 108 Ill. 2d 286, 296 (1985). Section 510(a) of the Illinois Marriage and Dissolution of Marriage Act (Act) covers modifications of child support payments, providing that support "may be modified only *** upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a)(1) (West 2016). The burden of demonstrating a substantial change in circumstances is on the party seeking the modification. *In re Marriage of Lyons*, 155 Ill. App. 3d 300, 304-05 (1987). To establish the change necessary to warrant an increase in support, a petitioner must show that the child's needs and the noncustodial spouse's ability to pay have increased. *In re Marriage of Adams*, 92 Ill. App. 3d 797, 803 (1981). Once a determination is made that modification is warranted, the court should consider the factors set forth in section 505(a) of the Act. *People ex rel. Hines v. Hines*, 236 Ill. App. 3d 739, 745 (1992). Support should be determined by accommodating the needs of the children with the available means of the parties. *In re Marriage of Riegel*, 242 Ill. App. 3d 496, 498-99 (1993).

¶ 35    Traditionally, Illinois courts have held that "[t]he financial status of a current spouse may not be considered to ascertain the ability of a party to fulfill a child support obligation. This traditional rule is consistent with the specific statutory language of the child support guidelines and with the legislature's mandate that '[n]either husband or wife shall be liable for the debts or

11

liabilities of the other incurred before marriage, and *** they shall not be liable for the separate debts of each other, nor shall the wages, earnings or property of either, nor the rent or income of such property, be liable for the separate debts of the other.' " 750 ILCS 65/5 (West 2014).

¶ 36   Nevertheless, there are instances where "courts have found that equitable principles require the consideration of a new spouse's income." *In re Marriage of Drysch*, 314 Ill. App. 3d 640, 646 (2000). For example, it is appropriate to consider the financial status of a current spouse in order "to determine whether the payment of child support would endanger the ability of the support-paying party and that party's current spouse to meet their needs." *In re Marriage of Keown*, 225 Ill. App. 3d 808, 813 (1992).

¶ 37   Likewise, it is appropriate for the trial court to consider the financial resources of a noncustodial father's new wife where her resources have been commingled with those of the noncustodial father. *In re Marriage of Baptist*, 232 Ill. App. 3d 906, 920 (1992). Courts also have the authority to compel parties to pay child support at a level commensurate with their earning potential. *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077 (2009).

¶ 38   In the present case, at the time the circuit court entered its order modifying James' child support obligation, section 505(a)(1) of the Marriage Act provided that in cases involving one child, the minimum amount of support that the court should award is 20% of the "Supporting Party's Net Income." 750 ILCS 5/505(a)(1) (West 2014). In proceedings in which a court must determine the amount of a parent's child support obligation, the separate income of a spouse can be relevant to the extent that the spouse's income frees up the parent's income so that the parent can pay more of his or her *own* income for the support of the child. Specifically, section 505(a)(2)(b) authorized the circuit court to deviate from the guidelines after considering, among other things, the parents' "financial resources and needs." 750 ILCS 5/505(a)(2)(b) (West 2016).

12

The legislature's use of the term "resources" in section 505(a)(2)(b) indicated that the legislature intended to allow the court to consider all the money or property to which the supporting parent had access, including a spouse's income, in determining whether to deviate from the minimum guidelines. See, *e.g.*, *In re Marriage of Drysch*, 314 Ill. App. 3d 640, 644-45 (2000) (discussing the legislature's use of the term "resources" in section 513 of the Marriage Act "rather than a more narrow term, such as 'income' or 'salary' ").

¶ 39     In this case, Emily agreed to the termination of child support in August 2010, in order to allow James the opportunity to get his investigation business up and running. Some five years later, Emily filed a petition for modification, asking that child support be reinstated. As part of the proceedings, James first filed a financial affidavit showing his total monthly living expenses were $5788.17. The affidavit further provided that he took a "draw," but only "as available." James attached to his affidavit a copy of his 2015 individual tax return which indicated his business incurred a net operating loss in 2015. However, based on the fact James swore that his living expenses amounted to nearly $6000 per month, it was clear that he had some additional source of income, or that he was, at least, the beneficiary of additional income, such as that of his wife, Jamie. During his testimony at the hearing in July, 2016, James revealed he had sold his house in 2014, and made a $32,000 profit. None of those proceeds were used to pay support for his children. But even adding this amount into the financial equation presented by James' affidavit, the amount was too low to allow James to have the type of lifestyle he was living.

¶ 40     During the July 26, 2016, hearing, James admitted that he and Jamie had a joint checking and joint savings account. He did not know what the balance was in either account. Additionally, James inflated his living expenses by including expenses for all of the members of the household, not just his own. James also submitted a document that purported to be his 2015

13

tax return. At the time he disclosed the document, James did not indicate that the return had been redacted. Therefore, James complied with discovery in a manner that did not allow Emily and her counsel to have all the facts needed at the time of the hearing. This lack of information necessitated the trial court reserving its final ruling until additional financial information was produced along with the unredacted 2015 tax return.

¶ 41    Subsequently, rather than producing the 2015 unredacted tax return, James filed motions that delayed the final ruling in this matter approximately seven months. During that time, James filed additional affidavits and convinced the court to partially reopen the proofs. At no time during this seven month period did the circuit court set a hearing to test the veracity of the affidavits James filed.

¶ 42    Jamie's testimony in July, 2016, was also less than forthcoming. Nevertheless, Jamie admitted that she and James combined their funds. Jamie testified during the hearing that she was not sure how much she earned in her business as an infertility consultant, although it was less than $100,000 per year. After the court ordered James to produce the unredacted tax return in its order of August 17, 2016, James attempted to block production of this 2015 unredacted tax return, and for good reason. Once produced, the 2015 tax return revealed that Jamie's gross income as an infertility consultant exceeded $300,000, although the net profit, after deductions for expenses, generated less. As previously noted, James submitted income tax returns for the operation of his business from 2008 through 2016. His gross receipts during these years ranged only from $5400 to $23,000. Thus, the record shows that James' spouse, Jamie, had a significant income which paid for much of the household expenses. This additional income was reflected by the disparity in the calculations submitted by James' attorney–the same calculations accepted as true by the trial court.

14

¶ 43   In its order finding Jamie's income relevant for consideration, the trial court specifically stated:

> "Because of [James'] spouse's income, [James] was able to have a home and minimal household expenses and the benefits of a healthy income while he started a business, earned his own income, albeit minimal, and paid no child support since 2010. Under these circumstances, [James] had ample resources with which to pay support, yet did not. The court will consider the salary of [James'] current spouse in its calculations of child support while he was living with her and not legally separated."

¶ 44   The trial court used the base pay child support calculations submitted by James' attorney in ordering child support in the amount of $467 per month from the date Emily filed the petition to modify to the date that James and his current wife claimed they were legally separated. The $467 award represented 20% of the parties' combined net income, adopted from the calculations made by James' attorney.  We cannot say that the trial court abused its discretion in awarding Emily the sum of $467 per month, payable from October 25, 2015.  Further, we find the trial court did not abuse its discretion in requiring James to pay the arrearage at the rate of $100 per month, and that as long as back child support was owed, James was not allowed to claim the minor child as a dependent. Moreover, we agree with the court's order that once the delinquent child support was paid in full, the parties would be allowed to alternate the years in which each claims the minor child for tax purposes.

¶ 45                                 II.  Physical Separation

¶ 46   The two remaining issues raised in this appeal relate to the trial court's orders regarding the legal separation of James and Jamie Rushing, and the amount of child support to be paid in the future in the event a court determines that James and Jamie are legally, and physically,

15

separated. We believe the trial court abused its discretion when it made findings regarding the amount of child support to be paid in the future, depending on whether a court determined that James and Jamie were legally separated. Specifically, we find the court abused its discretion when it entered the order reducing James' child support order to $170 per month after he and Jamie no longer reside together.

¶ 47    The record reflects that James and his wife, Jamie, was less than forthcoming throughout these proceedings. James maintained he had minimal income, but his lifestyle suggests the opposite. He profited $32,000 from the sale of his home but did not use any of the money for child support. The testimony at the July 26, 2016, hearing clearly revealed that James and his wife combined their resources. They filed their taxes jointly and maintained joint checking and savings accounts.  While bank accounts alone are not determinative, it was the trial court that was in best position to rule on the credibility of the witnesses and the evidence produced during the hearing.

¶ 48    In our view, the trial court abused its discretion when it allowed James to file affidavit after affidavit, each alleging new information.  The court allowed James to partially reopen the proofs when James alleged  he and his wife were legally separated. The court file, however, reveals that James and Jamie continued to live at the same address. Based upon these affidavits alone, and without the input of Emily, and without Emily being allowed to test the validity of the affidavits through a duly noticed hearing, the trial court accepted the averments by James as true. In our view, this was an abuse of discretion. Emily should have been allowed her day in court. This is especially true in light of the credibility issues raised by the multiple affidavits and the redacted 2015 tax return.  Because the trial court accepted the attestations regarding legal

16

separation, the court then reduced the amount of child support due depending on certain findings that would be made in an undefined Jefferson County divorce matter.

¶ 49    The order issued by the trial court reducing child support was an attempt to streamline the process, which we find admirable, especially in light of the delay occasioned by the failure to produce accurate financial information in a timely manner. But the August 17, 2016, order of the court to consider the combined income of James and Jamie was based on the evidence produced during the hearing on July 26, 2016. In the event James had a substantial change in circumstances that warranted a reduction in his child support, the Act gave him a path to follow, and would have allowed him to file a motion for reduction of his child support.  Instead, the trial court reduced the child support without affording Emily the opportunity to be heard, on a pleading which had not yet been filed.  In our view, this was an abuse of discretion, and that portion of the trial court's order reducing the child support is vacated. Should James experience a substantial change of circumstances and require a reduction in child support, then his counsel can advise him of the best means by which to achieve that goal. Any consideration of the legal status of the parties subsequent to the July 26, 2016, hearing is irrelevant, and to the extent the court made any findings related to that issue, those findings and the order of the circuit court are vacated.

¶ 50                                    CONCLUSION

¶ 51    We find the trial court was correct when it considered the joint income of James and Jamie is assessing child support in the amount of $467 per month, payable back to October 26, 2015.  Further the circuit court did not abuse its discretion in ordering that the arrearage be paid in the amount of $100 per month, and, and that as long as back child support was owed, James was not allowed to claim the minor child as a dependent. Moreover, we agree with the court's

17

order that once the delinquent child support was paid in full, the parties would be allowed to alternate the years in which each claims the minor child for tax purposes.

¶ 52    With regard to the circuit court's reduction of child support to the amount of $170 per month based upon some finding by another court at some future date to have been an abuse of discretion.   We therefore vacate the trial court's order regarding the status of the parties subsequent to July 26, 2016, and vacate any reduction in the child support award.

¶ 53    For the foregoing reasons the judgment of the circuit court of Marion County is affirmed in part and vacated in part.

¶ 54    Affirmed in part and vacated in part.

¶ 55    JUSTICE OVERSTREET, dissenting:

¶ 56    I respectfully dissent. This appeal stems from a petition to modify child support. The issue we must address concerns to what extent the circuit court can consider the net income of the supporting parent's spouse in determining the amount of child support the supporting parent must pay pursuant to the guidelines set out in section 505(a) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act), 750 ILCS 5/505(a) (West 2014). In applying these statutory guidelines, the circuit court combined James' net income with Jamie's net income and ordered James to pay 20% of that total amount. The plain language of the support guidelines, however, does not authorize this procedure for calculating a supporting parent's support obligation. For that reason, I would reverse the circuit court's judgment.

¶ 57    The majority correctly notes that Illinois courts have held that "[t]he financial status of a current spouse may not be considered to ascertain the ability of a party to fulfill a child support

18

obligation, but it may be equitably considered to determine whether the payment of child support would endanger the ability of the support-paying party and that party's current spouse to meet their needs." *In re Marriage of Keown*, 225 Ill. App. 3d 808, 813 (1992). This traditional rule is consistent with the specific statutory language of the child support guidelines and with the legislature's mandate that "[n]either husband or wife shall be liable for the debts or liabilities of the other incurred before marriage, and *** they shall not be liable for the separate debts of each other, nor shall the wages, earnings or property of either, nor the rent or income of such property, be liable for the separate debts of the other." 750 ILCS 65/5 (West 2014).

¶ 58    Under the Marriage Act, parents have an obligation to support their children financially. *In re Marriage of Duerr*, 250 Ill. App. 3d 232, 238 (1993). However, a spouse of a support-paying parent has no legal obligation to support his or her stepchildren financially. See *In re Marriage of Omelson*, 112 Ill. App. 3d 725, 734 (1983). In fact, a stepparent is not usually a party to proceedings involving the establishment or modification of child support for his or her stepchildren.

¶ 59    Here, at the time the circuit court entered its order modifying James' child support obligation, section 505(a)(1) of the Marriage Act provided that, in cases involving one child, the minimum amount of support that the court should award is 20% of the "Supporting Party's Net Income." 750 ILCS 5/505(a)(1) (West 2014). Importantly, the legislature did not define this statutory guideline with any language that would allow the circuit court to award 20% of the supporting party's *spouse*'s net income. Here, the circuit court's order, which combined James and Jamie's separate net incomes and ordered James to pay child support at 20% of that amount, was improper under the statutory language.

19

¶ 60    In proceedings in which a court must determine the amount of a parent's child support obligation, the separate income of a spouse can be relevant to the extent that the spouse's income frees up the parent's income so that the parent can pay more of his or her *own* income for the support of the child. Specifically, section 505(a)(2)(b) authorized the circuit court to deviate from the guidelines after considering, among other things, the parents' "financial resources and needs." 750 ILCS 5/505(a)(2)(b) (West 2016). The legislature's use of the term "resources" in section 505(a)(2)(b) indicated that the legislature intended to allow the court to consider all the money or property to which the supporting parent had access, including a spouse's income, in determining whether to deviate from the minimum guidelines. See, *e.g.*, *In re Marriage of Drysch*, 314 Ill. App. 3d 640, 644-45 (2000) (discussing the legislature's use of the term "resources" in section 513 of the Marriage Act "rather than a more narrow term, such as 'income' or 'salary' ").

¶ 61    In such circumstances, however, the inquiry is not whether the new spouse's income can be used to help pay the support obligation; rather, as I outlined above, "a trial court can consider the parties' assets and other elements of financial resources, even the financial status of a current spouse, to determine *whether payment of support would endanger the ability of the support-paying party and that party's current spouse to meet their needs.*" (Emphasis added.) *In re Marriage of Deike*, 381 Ill. App. 3d 620, 627 (2008).

¶ 62    Therefore, in the present case, evidence that James enjoyed Jamie's income for purposes of meeting his daily living and household expenses could have been relevant in determining whether the court should deviate from the statutory guidelines and order James to pay more than 20% of *his* net income for the support of his child. Here, however, the court did not consider Jamie's income as a basis for deviating from the statutory guidelines. Instead, the court

improperly applied the statutory guidelines to James and Jamie's separate incomes combined, thereby effectively requiring Jamie to pay 20% of her net income toward the support of a stepchild that she had no legal obligation to support. Nothing within the statutory language of section 505(a) allowed the court to apply the support guidelines to the net income of a stepparent under these circumstances.

¶ 63    Also, I note that section 502(a)(2) provided that, if the court deviates from the guidelines, the court must state the amount of support that would have been required under the guidelines, if determinable, and set forth the reasons for the variance from the guidelines. 750 ILCS 5/505(a)(2) (West 2016). Here, the circuit court did not articulate a basis to deviate from the guidelines, although evidence of Jamie's finances might have provided a basis for it to do so had it considered the evidence in that light. Instead of considering a deviation from the guidelines, during the hearing, the court noted that neither party had requested the court to deviate from the statutory guidelines in their pleadings; therefore, the court concluded that the amount of support James must pay would be calculated by simply applying the guidelines.

¶ 64    In reaching my conclusion, I am persuaded by the court's reasoning set out in *In re Parentage of M.M.*, 2015 IL App (2d) 140772. In that case, the court explained the relevance of a spouse's income in a proceeding involving the allocation of a child's educational expenses under section 513 of the Marriage Act, 750 ILCS 5/513 (West 2012). The court's analysis in *M.M.* applies equally to the application of the statutory guidelines for child support in section 505(a) of the Marriage Act.

¶ 65    In *M.M.*, the trial court had to allocate a child's college expenses between the father and the mother of the child. *Id.* ¶ 1. The mother did not have any income, but her husband was employed as an engineer and paid all of their monthly expenses. *Id.* ¶ 10. In considering the

21

parents' incomes for purposes of allocating colleges expenses, the trial court imputed the income of the mother's husband to the mother, suggesting that the husband's income was available to the mother for purposes of contributing to the child's college expenses. *Id*. ¶¶ 24-25. The *M.M.* court held that this was in error. *Id*. ¶ 29.

¶ 66    The statutory provision at issue in *M.M.* authorized the court to "award sums of money out of the property and income of either or both parties, ***, as equity may require, for the support of the child or children of the parties who have attained majority." 750 ILCS 5/513(a) (West 2012). Similar to section 505(a)(2)(b), section 513(a) of the Marriage Act provided that, when awarding educational expenses, the relevant factors the court could consider included "the financial resources of both parents." *M.M.*, 2015 IL App (2d) 140772, ¶ 32.

¶ 67    The *M.M.* court held that, under this statutory language, the court could consider a spouse's income as part of the mother's "financial resources," but only "to the extent that [the spouse's] assistance frees up [the mother's] own assets for contribution." *Id*. ¶ 33. The *M.M.* court held that the lower court should not have used the spouse's income "as the baseline for determining [the mother's] contribution toward [the child's] college expenses." *Id*. ¶ 43. The court stated that, "[b]y doing so, the court effectively shifted the burden to [the spouse] to pay for [his stepchild's] college expenses, something that he has no legal obligation to do." *Id*.

¶ 68    This reasoning applies equally in the present case with respect to child support guidelines under section 505(a) of the Marriage Act.  Here, the circuit court erred in combining James and Jamie's separate net incomes in determining the baseline amount of James' net income for purposes of calculating child support under the statutory guidelines. By doing so, the court effectively burdened Jamie with paying 20% of her net income to support a stepchild that she had no legal obligation to support. See *id.*

¶ 69    In combining James and Jamie's separate net incomes for purposes of applying the statutory child support guidelines, the circuit court cited *Drysch*, 314 Ill. App. 3d at 646, where the court stated that "several reviewing courts have found that equitable principles require the consideration of the new spouse's income." However, *Drysch* does not support the circuit court's application of the child support guidelines to a stepparent's income.

¶ 70    In *Drysch*, the Second District held that the court could consider a spouse's income as part of the supporting parent's "financial resources" for purposes of section 513 of the Marriage Act. *Id*. at 645. In *M.M.*, however, the Second District subsequently explained that, in *Drysch*, they neglected to "explain exactly *how* a court may consider a new spouse's income." (Emphasis in original.) *M.M.*, 2015 IL App (2d) 140772, ¶ 34 (discussing *Drysch*). The *M.M.* court explained that its holding in *Drysch* stood only for the proposition that the new spouse's income was relevant to the extent that it paid monthly expenses and freed up the supporting parent's income for assisting the child. *Id*. ¶¶ 33, 39 (discussing *Drysch* and *Street v. Street*, 325 Ill. App. 3d 108 (2001)). See also *In re Marriage of Cianchetti*, 351 Ill. App. 3d 832, 835 (2004) ("[a]lthough [the mother's] new husband is not obligated to pay for her children's tuition, and his income should not be used to determine her ability to pay tuition, it is properly used to examine the extent to which her income can be freed through reliance on her husband for support.").

¶ 71    The majority cites *In re Marriage of Baptist*, 232 Ill. App. 3d 906, 920 (1992) as justification for applying undefined "equitable principles" to require James to pay 20% of Jamie's income. That case, however, supports my conclusion that the circuit court improperly applied the child support guidelines by including a stepparent's income in its calculation. In *Baptist*, the lower court awarded the mother child support in an amount greater than what was required by the support guidelines. The evidence in that case showed that the father's income

23

decreased when he transferred part of his business interests to his current spouse. *Id.* at 910. The father exchanged one-half interests in his businesses to his new spouse in exchange for one-half equity interest in his wife's premarital home. *Id*. The father and his spouse shared joint financial accounts. *Id*

¶ 72    In determining the amount of the father's child support obligation, the circuit court indicated that it considered section 505's guidelines, including "the financial resources" of the parents. *Id*. at 911. The court, however, did not combine the income of the father and his spouse and apply the statutory guidelines to that amount. Instead, the court determined that 20% of the father's net income was $485 per month and ordered the father to pay $650 per month, an amount greater than what was required by the statutory guidelines. *Id*. On appeal, the father argued, among other things, that "the trial judge's upward deviation from the mandated minimum support guidelines was against the manifest weight of the evidence." *Id*. at 918. The court, however, disagreed and found that the circuit court did not error in deviating from the statutory guidelines. *Id*. at 919.

¶ 73    Importantly, nothing within the *Baptist* court's decision with respect to its discussion of deviating from the statutory guidelines indicates that the court authorized an "equitable" procedure involving the combination of the husband's and his spouse's separate incomes and the award of child support based on a percentage of the combined incomes. Instead, the court specifically calculated the father's net income and based its support award on a percentage of his income alone, albeit a percentage greater than the amount called for by the statutory guidelines.

¶ 74    In *Baptist*, the father argued on appeal that the lower court improperly "considered" his spouse's income, and the wife actually agreed that the spouse's income was "not directly relevant to the support determination." *Id*. at 919. The court, however, noted that the father's

attorney called the wife as a witness, elicited some of her testimony about her earnings, and did not object to other questioning on this topic during the hearing. *Id*. The court, therefore, held that the father waived his argument that the court improperly "considered" this evidence. *Id*.

¶ 75    Also, with respect to relevancy, the *Baptist* court noted that the father's spouse sought and was granted leave to intervene in the proceedings "to protect her own financial interests, which she conceded were commingled with [the father's]." *Id*. at 920. The *Baptist* court, therefore, explained the evidence's relevancy as follows:

> "Without testimony about [the new spouse's] income and net worth, the trial judge could not determine *** what interests were [the spouse's] and, therefore, *not subject to consideration in determining [the father's] child support obligation.* The trial judge had no alternative mechanism for determining [the father's] financial resources than to also consider what financial resources [the spouse] claimed were hers." (Emphasis added.) *Id.*

¶ 76    The *Baptist* court also noted, as I have noted above, that "a current spouse's income can be equitably considered to determine whether the child support obligation would imperil the supporting parent and his or her spouse's ability to meet their needs." *Id*.

¶ 77    Here, the circuit court did not consider Jamie's income merely to determine whether its child support order would impair James and Jamie's ability to meet their needs. Instead, the court improperly combined Jamie's net income with James' net income and used that amount to calculate James' support obligation under the statutory guidelines. Nothing within the *Baptist* decision sanctions this process for implementing the statutory guidelines. Instead, the *Baptist* court specifically stated that the spouse's income was "not subject to consideration" in determining the support obligation of the parent. *Id*.

¶ 78    Furthermore, I note that, unlike the facts in *Baptist,* here, James was not a partner in Jamie's infertility consultation business and Jamie was not a partner in James' investigation business. Jamie's uncontroverted testimony was that James was not involved in her infertility consultation business in any capacity. Accordingly, the circuit court was not presented with a situation in which James and Jamie comingled their financial resources to the extent that the court could not separate their respective incomes.

¶ 79    As justification for applying "equitable principles," the majority outlines the prehearing procedure leading up to the circuit court's ruling, during which James and his attorney vigorously litigated this contested issue, implying that James and his attorney attempted to undermine the circuit court's ability to make a proper child support award.  I note that if James had engaged in any improper litigation tactics leading up to the circuit court's findings with respect to net income, Emily could have requested sanctions pursuant to Illinois Supreme Court Rules 137 (eff. July 1, 2013). No such sanctions were requested, and the circuit court made no findings that James engaged in improper litigation tactics. The majority's dissatisfaction in how James litigated his position in the lower court is not a proper consideration in reviewing the substance of the lower court's child support determination under the language of the support guidelines.

¶ 80    In applying "equitable principles," the majority also concludes that "at no time during this seven month period did the circuit court set a hearing to test the veracity of the affidavits that James filed." However, I question the relevancy of this observation. As the majority also correctly observes in paragraph 33 of its opinion, "the trial court accepted the calculations made by James' counsel [with respect to his and Jamie's net incomes], and *Emily has not contested those calculations.*" (Emphasis added.) Majority op., ¶ 33. The circuit court found that, as of

26

August 31, 2016, James' and Jamie's combined net incomes equaled $2336 per month, and the majority accepts this amount in affirming the circuit court's child support award that was based, in part, on James' financial affidavits.

¶ 81    As further justification for applying "equitable principles," the majority also *sua sponte* questions Jamie's credibility by characterizing her testimony as "less than forthcoming." Again, I question the relevancy of this conclusion in light of the circuit court's undisputed finding that the parties' combined net income was $2336 per month. In addition, I note that the circuit court never made any adverse finding with respect to Jamie's credibility, and the record simply does not justify a *sua sponte* adverse credibility finding by the appellate court. The majority states that the joint tax return showed that Jamie's infertility consultation business generated over $300,000 in gross income "*although the net profit, after deductions for expenses, generated less.*" (Emphasis added.) I note that the joint tax return, specifically, showed that Jamie's infertility business generated a net income of $32,247 in 2015. Although irrelevant to the issue on appeal, I feel obligated to note that the tax return corroborated Jamie's testimony that her income from her business was less than $100,000 per year.

¶ 82    Finally, to the extent that the majority's application of "equitable principles" or the circuit court's order could be construed as imputing income to James on some other basis, this would also be improper without any findings supporting such a construction of the court's order. See *M.M.*, 2015 IL App (2d) 140772, ¶ 44. In *In re Marriage of Sweet*, 316 Ill. App. 3d 101, 107 (2000), the court stated, "[I]f a court finds that a party is not making a good-faith effort to earn sufficient income, the court may set or continue that party's support obligation at a higher level appropriate to the party's skills and experience." In order to impute income to a party, the court must find that the party is voluntarily unemployed, is attempting to evade a support obligation, or

27

has unreasonably failed to take advantage of an employment opportunity. *In re Marriage of Gosney*, 394 Ill. App. 3d 1073, 1077 (2009).

¶ 83    In the present case, the circuit court did not make any findings that James was voluntarily underemployed, was attempting to evade a support obligation, or had unreasonably failed to take advantage of any employment opportunity. Therefore, the circuit court made no findings that would justify imputing income to James under any of the circumstances set out in *Gosney*.

¶ 84    The majority begins the analysis portion of its opinion by noting that modification of child support is warranted upon a showing of a substantial change in circumstances (750 ILCS 5/510 (West 2016)), and that trial courts have wide latitude in determining whether a substantial change in circumstances has occurred. *In re Marriage of Riegel*, 242 Ill. App. 3d 496, 499 (1993). The majority then ends its analysis with the conclusion that the circuit court did not abuse its discretion.

¶ 85    In the present case, however, neither party contested the issue of whether there had been a substantial change in circumstances. The issue before us concerns the circuit court's application of the statutory child support guidelines contained in section 505(a)(1) of the Marriage Act as it read at the time the circuit court entered its support order. 750 ILCS 5/505(a)(1) (West 2014). Because there was no issue before the circuit court with respect to whether it should deviate from the guidelines, the matter before the court concerned only the application of the guidelines to the "supporting party's net income." Whether Jamie's net income could be included in the court's support calculation under the guidelines is a matter involving statutory interpretation and is based on the language of the statute; it is not a matter involving the exercise of the lower court's discretion.

¶ 86    For the reasons I have outlined above, based on the language of the statute at issue, I would reverse the circuit court's child support award and remand with directions for the circuit court to calculate James' child support obligation under the guidelines based on a percentage of only James' net income.

2018 IL App (5th) 170146

NO. 5-17-0146

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| EMILY R. RUSHING, n/k/a/ Moore, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 08-D-48 |
| | ) | |
| JAMES S. RUSHING, | ) | Honorable |
| | ) | Ericka A. Sanders, |
| Respondent-Appellant. | ) | Judge, presiding. |

**Opinion Filed:** **November 30, 2018**

| | |
|---|---|
| **Justices:** | Honorable Richard P. Goldenhersh, J. |
| | |
| | Honorable Judy L. Cates, J., concurred |
| | Honorable David K. Overstreet, J., dissented |

| | |
|---|---|
| **Attorney for Appellant** | Curtis W. Martin, Shaw & Martin, 117 North 10th Street, Suite 200, P.O. Box 1789, Mt. Vernon, IL 62864 |
| | |
| **Attorney for Appellee** | Cheryl A. Powell, 407 South 27th Street, Suite B, Mt. Vernon, IL 62864 |